## *In re* THOMPSON'S ESTATE.

### (*Surrogate's Court, New York County.* January 26, 1889.)

WILLS—CONSTRUCTION—DEFICIENCY IN INCOME FROM TRUST FUND.

Testator owned different stocks and bonds, selected with a view to their permanency and productiveness. He set apart four funds, comprised as nearly as possible of equal proportions of the same kinds of securities, and placed them in trust to pay the income to certain legatees. To guard against a temporary default or delay in the payment of the income on any of the securities, he set apart another fund to be divided into four equal parts, the income, and, if necessary, the principal, to be applied to make up such delay or deficiency; the four amounts, and the unexpended income from them, to go to the residuary estate when no longer needed for the purpose mentioned. The executors were advised not to change any of the securities unless for good reasons. There occurred a total failure to pay dividends on one class of stock, and for years payment was made from the reserve fund measured by the dividends paid on said stocks in the first year after testator's death, with the assent of the *cestuis que trustent.* Some of the stocks became less productive than at testator's death. *Held*, that a mere diminution in the dividends of any stock should not be made up from the reserve fund, as testator must have contemplated fluctuations in the earnings, but the reserve should only be drawn upon in case of a total failure of income, in which event the amount drawn should be measured by the dividends on such stocks, earned in the year following testator's death.

On exceptions to trustee's account.

The accounts of William Pritchard, surviving trustee under the will of William D. Thompson, deceased, were before the surrogate for adjudication, and were referred to a referee. All parties excepted to the referee's report.

*Lewis Sanders*, for executors of John B. Thompson. *Jas. L. Greves*, for executors of John Lee Smith, formerly co-trustee with the accounting trustee. *Eugene H. Pomeroy*, for Charles R. Thompson. *Duncan Smith*, for William Pritchard, trustee.

RANSOM, S. The question is, what was the real intent of the testator under the second, third, fourth, fifth, sixth, and thirteenth clauses of his will? The clauses second to sixth, both inclusive, are substantially alike in language and meaning. What effect the thirteenth clause has upon those mentioned, to which it relates, is the point in dispute. By the second clause the testator directs his executors to "select such of my productive bonds and stocks, amounting at their par value to the sum of five hundred thousand dollars, as shall at my decease be the most valuable, in proportion to their par value, and to make a fair and equal division thereof into five equal parts, of the value at par of one hundred thousand dollars each, an equal proportion, as near as may be, of the same line of bonds or stocks to be assigned to each share. One of said shares, amounting at par to one hundred thousand dollars, I give and bequeath to my nephew, John B. Thompson, of the city of New York, who has been a faithful assistant to me for many years, to his sole use and disposal, forever." By the third clause of his will the testator

provided: "One other of said shares, amounting at par to one hundred thousand dollars, I give and bequeath unto my executors herein named, or such of them as shall qualify and act as executors of this, my will, the survivors and survivor of them, and their successors and assigns, upon the trusts, and to the intents and uses, following,—that is to say, to collect and receive the interest and dividends thereon falling due after my decease, and out of the net income to apply to the use of my nephew," etc.

There is no substantial difference, as already observed, between the third clause quoted and the fourth, fifth, and sixth clauses, except the addition of the word "income" to the phrase as it is given in the third clause, so that it reads "net interest, dividends, and income thereof" instead of "the interest and dividends." I attach no importance to this change. The meaning is the same. The thirteenth clause of the will is as follows: "As my property consists mainly of securities and stocks, which I have selected on account of their sound and permanent value, it is my will that my executors should be under no obligation to change such investments, and in no way responsible for omitting to do so, and in general I advise that they should not change them except as they may from time to time see good and sufficient reason for doing so. And for the purpose of more certainly guarding against any temporary or other failure of income upon said bonds or stocks, so long as the same shall constitute the whole or any part of the four shares mentioned and placed in trust under the third, fourth, fifth, and sixth clauses of my foregoing will, I do further direct my executors to set apart, out of the most valuable, in proportion to their value, of my remaining bonds and stocks, the amount of thirty-two thousand dollars at par, and to divide the same into four equal parts, designating them, respectively, one to each of the said four trusts, and to hold the respective parts, and receive the income thereof, during the continuance of the trust for which they are respectively designated; and if it shall happen during such continuance that there shall be any default or delay in the payment of the interest or income of either of said trust funds, then the income of the corresponding part of said amount of thirty-two thousand dollars, or so much thereof as may be necessary, and, if need be, the principal, or any part thereof, shall be applied to make good such deficiency, and so much of the income of said amount of thirty-two thousand dollars as shall not be required to make good such deficiency shall go and be disposed of annually as part of my residuary estate; and, upon the termination of each of said trusts, the principal of the corresponding part of the said amount of thirty-two thousand dollars, or so much thereof as shall then remain, shall go and be disposed of as part of my residuary estate."

The general and inflexible rule of construction of a will is, the language of the testator should be construed according to its primary and ordinary meaning, unless he has manifested his intention in the will itself to give to it a different and more extended signification. *Hone* v. *Van Schaick*, 3 N. Y. 540; *Van Nostrand* v. *Moore*, 52 N. Y. 18; *Wylie* v. *Lockwood*, 86 N. Y. 298. *Wake* v. *Varah*, L. R. 2 Ch. Div. 348, lays down the rule of construction of a will, that the language of the testator should be literally interpreted, "unless satisfied, upon a consideration of the whole contents of the will, not only that the language used was insufficient to effect his full intention, but that the will itself afforded sufficient evidence of what his intention was." In that case it was said to be "apparent that the testator had not used language adequate to provide for all the events for which he had expressed his intention to provide." This case is cited approvingly by the court in *Wylie* v. *Lockwood, supra.*

The plain import and meaning of the will of Thompson is contrary, in my view, to the construction given to it by the learned referee, in the respect that he meant to fix the exact amount of annual income from the several trusts he directed should be set up. There is no ambiguity in his language. He pro-

vides that the beneficiaries shall receive the net interest, dividends, and income annually. The language used by him is apt to disclose his intention. An examination of the whole will makes his intention plain. There is no possibility of rightly invoking the rule that in some cases it is the duty of the court to subordinate the language to the intention. All the parties to this proceeding have filed exceptions to the referee's report. I first consider the chief point in dispute, already stated, and which is presented by the exceptions of the surviving trustee, the executors of John B. Thompson, and the executors of John Lee Smith, the two deceased trustees. It is clear to me that the testator did intend to fix a standard of income as of the day of his death, which should be the measure of the liability of the guaranty fund in case of a total failure of income on the particular stock or bonds first put into the trust by the executors, or any that might be properly substituted therefor, and all concerned have really so construed the will. The trustees made up the default on the St. Nicholas Bank stock by paying the *cestuis que trustent* an amount equal to the dividends earned and paid thereon during the first year after the testator's death; also, same amount on the Midland bonds. Here, then, was a standard of income in case of total default, or, in other words, entire loss of income. But I do not think this testator meant to provide for diminution of income; that is, he did not intend more than that the trust should produce something each year. So far as the bonds were concerned, they must produce a fixed and certain income each year, or none at all; and, in the latter case, the guaranty fund was liable to make good the default or deficiency, and, of course, such deficiency must be the amount of interest earned on the bond, as provided for by its terms. Hence we have the standard of income on the bonds of the testator, which he directed should be put into these trusts. This standard is found in the bonds themselves. Such was the construction of the trustees who paid the defaulted coupons on the Midland bonds. As to the stocks owned by the testator at his death, and which he directed should be put into these trusts, he evidently intended that all net income, whatever it might be, derived from dividends thereon, should go to the beneficiaries; but he did not mean to fix such income arbitrarily. No such intention can be imputed to him. He knew of the fluctuating earnings of corporations, and that all dividends must be paid from earnings; that the dividends in one year might be more or less than those of any previous year. His intention was that the beneficiaries should have the actual dividends on those stocks, and that the stocks should produce dividends each year, but in case of default and total failure to produce dividends in any year, then the guaranty fund should make good; and, as I have seen, the measure of that fund's liability in such an event must be found to have been, in the mind of the testator, the dividend earned on the stock at the time of his death, or any properly substituted therefor, and the dividends on it at the time of such substitution.

Any other construction seems to be unwarranted. If the testator had intended that these trust estates should produce a fixed income, he would have said so in unmistakable terms. If he had had such a thought, and had intended to elucidate it and give it effect, we should find language in his will plainly expressive of such intention. There is not, in my view, a single earmark that he had such a thought in his mind. It is not at all likely that he had any idea that the stocks would not earn dividends each year during the life of the trusts, respectively, but, for the purpose of providing, so far as $32,000 and income thereon would go, for total loss of interest and dividends in any year, he set aside the guaranty fund. He has left us without the clearest words of his intention of the measure of the guaranty fund's liability in such an event, but, as already remarked, he no doubt intended—at least, such is the obvious and only inference from the language used by him—that the dividends earned at his death should be the standard of such liability. This

construction has been given by the trustees, and acquiesced in for many years by the *cestuis que trustent,* as witness payment by the trustees of the defaulted dividends on the St. Nicholas Bank stock. They found the measure of the guaranty fund's liability in that respect to be the dividends which were paid on that stock at or about the date of the testator's death. The testator's intention may be discovered by regarding the amount named by him as a sufficient guaranty fund. He firmly believed in the productiveness of his securities during the continuance of these trusts, but in order to indemnify the beneficiaries for any possible loss by temporary delays in payment of the income produced each year, he set aside this small guaranty fund. The fate of this fund, under the construction given by the learned referee of the will, seems to me convincing proof that his construction is at variance with the real intention of the testator. The testator knew that some of these securities must mature before the trusts could possibly terminate, and that their proceeds in money would come to the hands of the trustees, whose duty it would be to invest it. It cannot justly be said, I think, that, pending any such investment, the guaranty fund should pay the same rate of interest as that provided for in the matured security. Not more than lawful interest could have been lawfully charged, and I doubt if more than the trustees were able to obtain on actual investment could have been required. On such investment, made in good faith by the trustees, the guaranty fund would have been liable for a total failure of the interest provided for by the terms of the contract for that investment, not for the rate of interest provided for by the terms of the matured securities; and just so in regard to any dividend paying stock which was set apart by the trustees out of the stock left by testator. The trustees had the right to change the securities in these trusts. If they had done so, by a proper exercise of this power, and had, as in duty bound to do, replaced them with other stock, no one, I think, will insist that the guaranty fund would be liable, in case of default or temporary failure of dividend on such stock, to the amount paid on the displaced stock; but, instead, it would be liable for such dividend as the replacing stock received at the time it became a part of the trusts.

I feel compelled to disagree with any other construction of this will. It follows, therefore, that the amount found now due to the *cestuis que trustent,* which was ascertained by finding the difference between the interest and income actually received on the trusts the first year after the testator's death, and the aggregate interest and income actually paid them for the several years since, must be disallowed, and in that regard I must overrule the learned referee.

The first exception of the trustee to the sixteenth finding of fact is sustained, because I do not deem it lawful in this proceeding to modify or vacate any provision of the decree of December, 1875. A direct application should be made for that purpose, if the trustee is so advised. All other exceptions of the trustee except the tenth must be sustained, for reasons given for my construction of the will. The tenth exception is overruled, because, in my view of the testator's real intentions, the effect of the statute of limitations is not material. The exceptions of the executors of John Lee Smith are also all sustained, except the sixth, which is, in effect, the same as the trustee's tenth, and is overruled for the same reason. As to the exceptions of the executors of John B. Thompson, the first, fifth, sixth, and seventh are sustained; the second, third, eighth, and ninth are overruled. The exceptions of Charles R. Thompson are overruled.